619 So.2d 1116 (1993)
Lorenza KNIGHT
v.
DEPARTMENT OF POLICE.
No. 91-CA-2448.
Court of Appeal of Louisiana, Fourth Circuit.
May 27, 1993.
*1117 Dale W. Poindexter, Poindexter & Oxner, New Orleans, for plaintiff-appellant, Lorenza Holmes Knight.
William D. Aaron, Jr., City Atty., George A. Blair, III, Deputy City Atty., Brett J. Prendergast, Chief of Civil Litigation, New Orleans, for Department of Police.
Before CIACCIO, WARD and ARMSTRONG, JJ.
WARD, Judge.
The Superintendent of Police ordered Captain Lorenza Knight involuntarily retired from the New Orleans Police Department for racist remarks Knight made during a telephone conversation with a subordinate while he was on duty. Knight, a 25 year veteran with an exemplary service record, appealed to the City Civil Service Commission. The Civil Service hearing was before a hearing officer and a transcript of the hearing was submitted to a panel of three of the five members of the Civil Service Commission. On the basis of the transcript, that panel found the charges proven, but determined that the disciplinary action was too severe. The panel then modified the Superintendent's order, reducing it to 120 days suspension without pay. The City asked for a rehearing before the entire Board of five members, and after granting the rehearing, the Board reversed itself, dismissed Knight's appeal, and upheld his involuntary retirement.
Knight appealed to this court. He does not dispute that he made racist remarks about one police officer while speaking with another police officer in a telephone conversation, but he argues that the administrative investigation and the civil service hearing were flawed. He also argues that the disciplinary action is unusually severe and unwarranted.
The telephone conversation was between Knight and Police Officer John Reilly of the command desk. Knight made those racist remarks about a black female police officer who had just disobeyed a direct order. That telephone conversation was intercepted and recorded just as all other incoming calls to police headquarters. The conversation took place on August 6, 1988.
Officer John Reilly who was working on the command desk of police headquarters paged his field supervisor, Captain Lorenza Knight, through a digital recorder which required that Knight telephone the calling number. Knight returned the call to police headquarters from a pay telephone. Officer Reilly reported a problem with another police officer, Cathy Carter, who refused to investigate a traffic accident in spite of being ordered to do so. When Reilly reported that Carter had just gone home, ignoring the order, Captain Knight made derogatory statements about Carter in particular and about the black race in general.
During his conversation with Knight, Sergeant Reilly told Knight that he also notified Major James Howley, the night supervisor, that Cathy Carter had refused to obey his order to investigate a complaint. Howley ordered preparation of a DM-1 report to commence an investigation of Carter that would lead to disciplinary action. Sergeant Melvin Howard was assigned to investigate Officer Carter's alleged misconduct. During the course of that investigation Sergeant Howard went to the Communications Center and found *1118 the recorded conversation between Knight and Reilly. Howard informed Superintendent Woodfork, who referred the matter to the Internal Affairs Division (IAD) for an investigation. Major Salles of IAD conducted a preliminary investigation and informed Superintendent Woodfork that a disciplinary hearing was justified because Salles believed Knight had violated the prohibition against public criticism, Rule 6, and Rule 4, relative to neglect of duty.
Acting on Major Salles's report, Superintendent Woodfork sent Captain Knight a letter informing him of the disciplinary hearing. Woodfork gave Knight an opportunity to answer the charges, and to present mitigating facts. After the hearing, Woodfork involuntarily retired Knight from the police department for violating Rule 6, paragraph 4, prohibiting public criticism, and Rule 2, paragraph 4, prohibiting discrimination. Woodfork found charges of violating Rule 4, neglect of duty, unproven.
We have considered each of Knight's twenty-five assignments of errors, but we have combined them in four issues that we believe warrant discussion.
(1) When the Internal Affairs Division of the Police Department investigated Knight's conduct, did the police investigation and the subsequent disciplinary hearing deny Knight constitutional due process of law or deny Knight other statutory rights known as the police officer's bill of rights?
Knight argues that the investigation violated due process requirements. Notice and an opportunity to respond are the basic requirements of due process, and before a tenured employee is discharged, he is entitled to oral or written notice of the charges against him, an explanation of his employer's evidence, and an opportunity to present his side of the story. Cleveland Board of Education v. Loudemill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
No one questions that civil service employment is a property right. The only question is whether the Department met the Loudemill requirements. In the investigative stage, Major Salles informed Knight of the nature of the investigation. Knight was permitted to listen to a recording of his conversation. This type of "fact" notice met the requirements of due process. Knight was given an opportunity to be heard. He could even elect to have his counsel present. He read a prepared statement, answered several questions, and acknowledged his voice on the recording. From this information Knight could readily grasp the nature of the charges that he would be called to answer if the Superintendent conducted a disciplinary hearing. Thus, at least in the pre-disciplinary hearing stage, the Department complied with Loudemill.
We also reject Knight's argument that the police investigation violated Knight's statutory rights as a policeman, known as the police officer's bill of rights. R.S. 40:2531 et seq. The pertinent part requires that whenever a law enforcement officer is under investigation he shall be informed of "the nature of the investigation". Knight complains that he was not informed of the charges. While it is true Major Salles did not specify the exact formal charges, he told Knight: "The nature of this investigation is your alleged conversation with Officer John Reilly of the Command Desk when you used the word `nigger' several times during that conversation."
R.S. 40:2531 does not require that the law enforcement officer know the exact charges that may be brought against him. All that is required is that the investigating agency inform the police officer "of the nature of the investigation". What Major Salles told Knight complied with R.S. 40:2531.
(2) When the telephone conversation was recorded and transcribed, was there a violation of the Fourth Amendment to the United States Constitutions and/or the Louisiana Constitution's guarantee of privacy?
Knight contends there was, and he argues that the recorded and transcribed telephone conversation was erroneously relied upon by Superintendent Woodfork at the *1119 disciplinary hearing and wrongfully considered as evidence by the Civil Service Commission.
By statute, Louisiana has criminally sanctioned the conduct of intercepting oral communications, adopting most provisions of the uniform act. L.S.A.R.S. 15:1307 and 15:1303(C)(3) prohibits interception, recordation, or use of the contents of an illegal interception. Knight complains that interception, recordation, publication and use of the recorded conversation violates that law, and that to receive the tape in evidence condones violation of the law by the New Orleans Police Department. See L.S.A.R.S. 15:1303(A)(4).
Knight first argues that neither he nor Officer Reilly consented to the interception and the recording of their conversation. Knight produced an affidavit that he did not know the telephone lines to the police command posts were intercepted and recorded. He also produced a death bed affidavit from Reilly that he did not know of this. The affidavits are unconvincing. Reilly had previously testified that he knew the conversations were recorded. The commanding officer of communications testified that he always tells the members of his command that the incoming lines are intercepted; that there is one line not intercepted which is for the private use of communication personnel. Reilly was a current member of communications stationed on the command desk. Knight had been a platoon commander in communications in 1977. And in this very telephone call, when Reilly was speaking with Knight, discussing how he could prove police officer Cathy Carter disobeyed a lawful order of a superior, Reilly said: "I will just play the tape back, she was ordered over the radio to handle it."
We conclude Knight knew incoming telephone calls to headquarters are regularly monitored and recorded. As a 25 year veteran he knew that telephone conversations are sometimes transcribed for use in the trial of criminal cases. Reilly on the communications desk certainly knew it. Under the circumstances, this is consent by Knight, and most certainly by Reilly. Thus, where there is consent of one of the parties, a telephone conversation may be intercepted and recorded, and is admissible as evidence. R.S. 15:1303(C)(4).
If not consent, then there is still another applicable exception which would permit consideration of the transcript as evidence. Law enforcement agencies may intercept and record in-coming telephone calls without consent. The Department applied a uniform policy of recording conversations for everyone. In Jandek v. Village of Brookfield, 520 F.Supp. 815 (N.D.Ill. 1981) the court ruled that the recording did not constitute a violation because it was done through the use of a telephone instrument being used by a law enforcement officer in the normal course of police business. The court noted that police departments commonly have recorded systems due to the need to preserve and to accurately recall messages pertaining to emergencies or to official police business ... such a system indiscriminately and routinely records all activities on established designated lines, and is not comparable to the selective use of recording equipment that eavesdrop in telephone conversations. Thus, we hold there was no illegal search or seizure which violated the Fourth Amendment nor was there a violation of any statutory prohibitions.
(3) Has the appointing authority proven the charges of violating Department of Police Rule 6, "Official Information"?
That rule states:
[M]embers shall not publicly criticize or ridicule the Department, its policies, or other expression, where such speech, writing, or other expression is defamatory, obscene, unlawful, undermines the effectiveness of the Department, interferes with the maintenance of discipline, or is made with reckless disregard for truth or falsity.
Knight correctly points out that his conversation was meant to be private, although it was not. Rule 6 "Official Information" is a prohibition against public criticism. That means it prohibits a police officer from bringing discredit on the department by publicly criticizing it or its policies.
*1120 This prohibition is constitutionally suspect, to say the least. See Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). We do not have to consider its constitutionality, however, because we find that the Commission committed gross error by finding that Knight violated Rule 6. This statute prohibiting public criticism cannot possibly have application to what was intended to be a private conversation.
(4) Was the finding of the appointing authority that Knight violated Rule 2, Section 4 "Discrimination", supported by the evidence?
Rule 2 Section 4, states:
A member shall not discriminate against or show partiality to any person because of racial, ethnic, religious, political, sexual, or personal prejudice.
Black's Law Dictionary, Fifth Edition, 1979 defines discrimination as:
... Unfair treatment or denial of normal privileges to persons because of their race, age, nationality or religion ...
Discrimination is unfair treatment as distinguished from racism which may indicate a state of mind. Racism may be the product of a malevolent heart, but it is not the same as discrimination. Both may be evil, and discrimination may be the product of racism, but discrimination requires an act. It means treating individuals differently, or denying them normal privileges because of race. In either case, some act is required. Knight may have racist thoughts and beliefs, but he was not guilty of discrimination because he did not act, no matter how vile his conversation nor wicked his thoughts. As a matter of fact, he could not take any action nor do anything to discriminate against Officer Carter because he did not give the order she disobeyed. He was powerless to do so. That order was given by Major James Howley, and it was Major Howley who initiated disciplinary action against Carter. Knight makes clear in his conversation with Reilly that it was up to Howley to take action, and, although Knight emphatically stated what he would do if he had given the order that Carter disobeyed, he did not do anything. We conclude that the Civil Service Commission and Superintendent Woodfork erred when they found Knight violated rules prohibiting discrimination.
The City in a fall back position argues that Knight violated Rule IX Section 1.1 of the Civil Service Rules. That particular rule is directed to appointing authorities, such as Superintendent Woodfork, and requires appointing authorities to enforce rules of their department. It is a grant of authority to the appointing authority to discipline employees who commit any act prejudicial to the civil service, not a rule regulating police conduct. In essence, it says that when a civil service employee fails to perform or cannot perform "the appointing authority shall take action warranted by the circumstances to maintain the standards of effective service." To further illustrate that Rule IX is directed to the appointing authorities, Section 1.2 of Rule IX says that when the appointing authority is contemplating termination, the appointing authority shall conduct a pre-termination hearing. Rule IX simply cannot be construed as a rule setting forth prohibited conduct by classified employees.
The Internal Affairs Division of the Police Department suggested that Knight violated Rule 4, Section b, of the Department's regulations, neglect of duty:
A member with supervisory responsibility shall be in neglect of duty whenever he fails to properly supervise subordinates, or when his actions in matters relating to discipline fail to conform with the dictates of Departmental Rules and Regulations.
Although Knight's conversation with Reilly exhibited a failure to properly supervise subordinates, Superintendent Woodfork said: "I have concluded that the charge of Neglect of Duty is unfounded, however I do sustain a charge of Discrimination in addition to the charge of Public Statements and Appearances." Knight may have been guilty of neglect of duty, but since Woodfork exonerated him, we *1121 cannot consider it, even if we believe Woodfork was wrong.
The burden of proof on appeal, as to the actual basis for the disciplinary action, is on the appointing authority. Id.; Goins v. Department of Police, 570 So.2d 93 (La. App. 4 Cir.1990). The City of New Orleans concedes that there is no other specific rule governing Knight's conduct, although at one time there was. For some unknown reason the department rule prohibiting the use of insulting or derogatory language was deleted from the regulations prior to Knight's conversation with Reilly. Major Salles of the IAD when testifying before the Civil Service Commission said:
We had a rule or a regulation which specifically covered an officer, and a regulation was written up that members of the department shall not use the term wop, kike, nigger, terms like this, and I could not find that regulation. I looked for it and looked for it, and I couldn't find it, and later learned that the regulation had been revised. (Tr.Vol. 3, pp. 40-41)
We conclude that the Police Department failed to prove Knight violated the prohibition against public statements or that he acted to discriminate. For these reasons we find the Civil Service Commissions finding of fact were manifestly erroneous, and we reverse.
Knight is hereby reinstated with all benefits and emoluments plus back pay subject to a set-off of retirement benefits received and of wages earned through outside employment during the period of his imposed involuntary retirement. R.S. 49:113; Werner v. Department of Police, 487 So.2d 598 (La.App. 4 Cir.1986).
REVERSED.
ARMSTRONG, J., dissents.