| JONES, Judge,
dissenting.
The majority opinion refers to a “great body of evidence” produced at trial to prove that Paul Lumbi, Administrator of Touro Shakespeare Nursing Home and Ms. Preen’s supervisor, discriminated against Ms. Preen because of race. This evidence included the testimony of Milton Barquet, a former employee of Touro-Shakespeare who was suspended pending termination and whose appeal of that action was pending before the Civil Service Commission at the time of Ms. Preen’s hearing. Mr. Barquet testified that Mr. Lumbi did not care for white people, specifically the volunteers at Touro-Shake-speare who were mostly white. According to Mr. Barquet, Mr. Lumbi excepted Ms. Leat-hum, the office manager at Touro-Shake-speare who he likes and who is white. Mr. Barquet, who worked at Touro-Shakespeare since 1986, testified that there were less white people employed at Touro-Shake-speare now. This fact was cited in isolation and there was nothing to suggest that in 1986 a different administration of the nursing home or administrative policy was in place. The statistics quoted by the majority, a 99% black staff at Touro-Shakespeare, do not seem unusual for lower wage scale, public sector employment. In fact, Ms. Preen testified that she applied for a position elsewhere while employed at Touro-Shakespeare because she was seeking higher wages.
Mr. Barquet also testified that Ms. Preen was generally considered more qualified than Ms. Randall, her successor as Director of Nurses. The record 12reflects that although Ms. Randall had never served as director of a nursing facility she had worked as a LPN at Touro-Shakespeare for several years. Ms. Randall had received a bachelor’s degree while Ms. Preen was still working on her bachelor’s degree. As a result of her advanced schooling Ms. Preen recommended that she be appointed Assistant Director of. Nurses and she was provisionally employed as Acting Director of Nurses after Ms. Preen’s suspension and subsequent dismissal. Mr. Lumbi testified that his goal was to hire a Director of Nurses with five years experience as a registered nurse and one year experience as Director of Nurses. When Ms. Preen was hired as the Assistant Director of Nurses and provisionally appointed to Director of Nurses she lacked these qualifications.
Another example of discrimination cited by the majority was that of Shaun Temple. Mr. Temple, who is white, was the business manager at Touro-Shakespeare who resigned as a result of personnel conflicts with a black employee that he repeatedly recorded as arriving to work tardy. Mr. Temple testified that Mr. Lumbi would have him change this worker’s time records. Mr. Temple did not testify that Mr. Lumbi asked him to do so because of any racially motivated policy.
The majority wrote that the testimony of Maria Placey supported a finding of discrimination. Ms. Placey, who is hispanic, is the former social worker at Touro-Shakespeare. She voluntarily resigned in July of 1990 and was replaced by a black woman without a Master’s Degree who had been working at Wal-Mart. She also testified that the former Director of Nurses had referred to a coworker as “poor white trash” in Mr. Lumbi’s presence and was not reprimanded. She testified that she considered this same coworker to be “poor white trash.”
Ms. Sarah Benjamin and Ms. Barbara Jackson, nursing assistants who are lablack, testified that they heard Sherleen Randall, Ms. Preen’s assistant, refer to Ms. Preen as “that white woman.” Ms. Preen reported this to Mr. Lumbi who did meet with Ms. Preen and Ms. Randall on more than one occasion to improve their working relationship. Ms. Jackson, who was suspended by Ms. Randall, allegedly resigned due to harassment by Ms. Randall and Mr. Lumbi and had an appeal pending before the Civil Service Commission at the time of Ms. Preen’s hearing.
Finally, the majority cited the testimony of Linda Carson, a former Assistant Director of Nurses at Touro-Shakespeare who is white. Ms. Carson was terminated from Touro-Shakespeare and appealed her dismissal but later dropped her appeal. She testified that while employed at the nursing home Mr. Lumbi “called attention to her being white”. She also testified that she found this embarrassing and it hurt her feelings. This con *1136 duct of Mr. Lumbi is what the majority calls racial discrimination.
Based on this evidence the majority concluded that Mr. Lumbi “tolerated, if not cultivated, an atmosphere of intolerance and antagonism toward white employees under his supervision.” The majority infers and suggests that this is the new standard in determining racial discrimination. This holding appears to be a great departure from case law in this area. Discrimination has generally been narrowly interpreted in the past. Specifically, I refer to this court’s recent holding in Knight v. Department of Police, 619 So.2d 1116 (La.App. 4th Cir.1993). In Knight, this Court reversed a Commission’s decision upholding the termination of a white police officer based on a finding that he discriminated against a black female subordinate. In that opinion this Court wrote:
Knight appealed to this court. He does not dispute that he made racist remarks about one police officer while speaking with another police officer in a telephone conversation, but he argues that the administrative investigation and the civil service hearing were flawed. He also argues that the disciplinary action is | unusually severe and unwarranted.
[[Image here]]
Officer John Reilly who was working on the command desk of police headquarters paged his field supervisor, Captain Loren-za Knight, through a digital recorder which required that Knight telephone the calling number. Knight returned the call to police headquarters from a pay telephone. Officer Reilly reported a problem with another police officer, Cathy Carter, who refused to investigate a traffic accident in spite of being ordered to do so. When Reilly reported that Carter had just gone home, ignoring the order, Captain Knight made derogatory statements about Carter in particular and about the black race in general.
[[Image here]]
Black’s Law Dictionary, Fifth Edition defines discrimination as:
... Unfair treatment or denial of normal privileges to persons because of their race, age, nationality or religion ...
Discrimination is unfair treatment as distinguished from racism which may indicate a state of mind. Racism may be the product of a malevolent heart, but it is not the same as discrimination. Both may be evil, and discrimination may be the product of racism, but discrimination requires an act. It means treating individuals differently, or denying them normal privileges because of race. In either case, some act is required. Knight may have racist thoughts and beliefs, but he was not guilty of discrimination because he did not act, no matter how vile his conversation nor wicked his thoughts....
Id. at 1117, 1120. Emphasis added.
To the extent that the majority’s opinion in the instant case represents a broader definition of discrimination I embrace it. In as much as Knight is the law, I must dissent from the majority’s finding that Ms. Preen was discriminated against by her supervisor, Mr. Lumbi, or the appointing authority, as represented by Dr. Jeff. This is a case where neither vile conversation nor wicked thoughts, let alone unfair treatment, have been proven. The record is void of any support for the majority’s conclusion that Ms. Preen’s termination was motivated purely by racial discrimination on Mr. Lumbi’s part. Neither the | shearing examiner nor the Commission made a specific finding that Ms. Preen was discriminated against by Mr. Lumbi or Dr. Jeff.
The hearing examiner, who had the benefit of hearing all the witnesses and weighing their credibility wrote in his report to the Commission:
... it was the impression of the Hearing Examiner that certain reasons for the termination were articulated by Mr. Lumbi and appeared to have at least some basis in fact. Several flaws and/or administrative problems at Touro-Shake-speare were brought out, but as counsel for appellant was reminded, it is the appellant’s burden to prove discrimination *1137 and the competence of Mr. Lumbi is not the issue before the Commission.
Emphasis added.
In the Commission’s opinion, which the majority relies upon, the language is ambiguous. The opinion reflects that the Commission found in the record “a number of acts and omissions which indicate discrimination on the basis of both race and age.” Yet the Commission fails to say by whom and against whom. The examples of discrimination, which are the same as those cited in the majority opinion, do not involve acts committed against Ms. Preen by Mr. Lumbi nor Dr. Jeff. Furthermore, the Commission failed to reinstate Ms. Preen. Obviously the Commission did not find her termination was racially motivated or it would have granted Ms. Preen the relief she sought. Thus, it is my opinion that the Commission, not unlike the hearing examiner, was concerned with the climate and racially conscious conduct at Touro-Shakespeare. However, neither fact-finder was convinced that Ms. Preen met her burden of proving discrimination.
The evidence clearly establishes that Ms. Preen was insubordinate and this evidence was unrefuted. In fact, Mr. Lumbi’s decision to suspend Ms. Preen resulted from an incident in which she stormed out of a staff meeting he was holding and her refusal to meet with him despite his requests. He later visited her office to discuss the incident and she was sitting idly in conversation uwith a co-worker although she had given him some pretext concerning work for not meeting with him. Ms. Placey, Ms. Preen’s own witness, testified that although she had not witnessed Ms. Preen yell at nor disrespect Mr. Lumbi, “Ms. Preen sometimes became impatient or exasperated. Ms. Preen would not be outdone.” Ms. Preen’s case, including all of her allegations and evidence offered at trial, was put forth to show that although she was terminated for insubordination there were many black employees at Touro-Shakespeare who violated policies and were not reprimanded. Examples of such violations included her predecessor as Director of Nurses who reportedly yelled at Mr. Lumbi, Mr. Lumbi’s secretary who also yelled at him, LPNs and nursing assistants who did not report to work timely nor who had excessive absences. Therefore Mr. Lumbi’s treatment of her was unequal.
It is my opinion that where there is no showing of an act of racial discrimination by Mr. Lumbi, Ms. Preen’s discipline for insubordination is justified by the nature of her insubordination. There is a very definite difference between the acts committed by other so-called “insubordinate” employees and the acts of Ms. Preen. Ms. Preen simply cannot show that Mr. Lumbi’s discipline of her was racially motivated when she is guilty of continuous and extreme acts of insubordination.
The record indicates that Mr. Lumbi disciplined and/or fired white as well as black employees; including a disproportionate number of witnesses called by Ms. Preen. Introduced into evidence were numerous memoranda written by Mr. Lumbi documenting inadequacies he found in Ms. Preen’s performance. These memoranda concerned her failure to supervise her employees due to unaccounted for absences, failure to meet expectations on work assigned to her, failure to work cooperatively with her assistant, and failure to monitor supplies.
kMs. Preen as well as some of her witnesses indicated they perceived an atmosphere of favoritism in that Mr. Lumbi, a black male, preferred young black females. This is not the same as alleging that Mr. Lumbi discriminated against white employees. Furthermore, there is nothing in the record concerning actions nor attitudes by Mr. Lumbi supporting Ms. Preen’s allegations that he wanted an all-black staff. Ms. Preen’s allegation that Mr. Lumbi harassed white employees until they quit is contradicted by her witnesses who testified Mr. Lumbi was seldom there and exercised little control over the facility. Finally, Ms. Preen testified that as a department head she had authority to hire nurses. She did not indicate that Mr. Lumbi prevented her from hiring any white nurses. Clearly, there was ample evidence that Mr. Lumbi had a legitimate basis for terminating Ms. Preen.
Civil Service Commission Rule IX, Sec. 1.3 provides:
*1138 In every case of termination, suspension, reduction in pay, or fíne of any employee in the classified service, or of involuntary retirement or demotion of the employee, within five (5) working days of the effective date of the action, the Appointing Authority shall furnish the employee and the Director of Personnel a statement in writing of the reasons therefor. The notification also must advise the employee of the possible right of appeal, which must be exercised within thirty (30) calendar days of the date of the disciplinary letter.
The Department cites Mr. Lumbi’s letter of October 15, 1990 suspending Ms. Preen for insubordination, which clearly states that she has 30 days to appeal to the Commission. A subsequent letter mailed to Ms. Preen on November 5, 1990 confirms that a pre-termi-nation hearing was rescheduled to accommodate her. It refers to an October 28th recommendation by Mr. Lumbi to Dr. Jeff that she be terminated and again notifies her of her right to appeal. Finally, on November 13, 1990, Dr. Jeff issued a letter of termination outlining reasons derived from Mr. Lumbi and from Ms. Preen’s pre-termination hearing. It includes notice of her right to appeal. Because the Appointing Authority, as ^represented by Dr. Jeff, did not provide Ms. Preen a written statement of reasons within five days of the disciplinary action it did not comply with the notification requirements in the Commission rules for classified employees.
I would amend the Commission’s decision to reflect that Ms. Preen’s suspension and dismissal is effective as of the date the Appointing Authority furnished notice, November 13,1990. I would limit the Commission’s award of back pay and emoluments to the period between October 16, 1990 through November 13,1990. I would affirm the decision of the Commission with this amendment.